IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING

**FRANKLIN C. HELLER, II, and
JEANIE HELLER,**

       Plaintiffs,

**v.**　　　　　　　　　　　　　　　　　　　**Civil Action No. 5:12-CV-46
(BAILEY)**

**TRIENERGY, INC.,
TRIENERGY HOLDINGS, LLC,
AB RESOURCES, LLC,
CHEVRON U.S.A., INC.
GRAY MONTAGUE, and
MICHAEL P. TROUT,**

       Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING REMAND AND COMPELLING ARBITRATION

Pending before this Court are defendants TriEnergy, Inc.'s and TriEnergy Holdings, LLC's Motion to Dismiss [Doc. 3], filed March 26, 2012; defendant AB Resources, LLC's Motion to Compel Arbitration or, in the Alternative, Motion to Dismiss [Doc. 7], filed March 30, 2012; defendant Chevron U.S.A., Inc.'s Motion to Compel Arbitration, or in the Alternative, Motion to Dismiss [Doc. 9], filed April 2, 2012; plaintiffs Franklin C. Heller, II's and Jeanie Heller's Motion to Remand [Doc. 10], filed April 25, 2012; and defendant Gray Montague's Motion to Dismiss [Doc. 17], filed May 8, 2012.  These motions have since been briefed and are now ripe for decision.  Having reviewed the record and considered the arguments of the parties, this Court concludes that the plaintiffs' motion to remand should be **DENIED** and the defendants' motions to compel arbitration should be **GRANTED**.

1

## BACKGROUND

### I.   Factual Allegations

This civil action arises from an oil and gas lease dated August 24, 2006, and entered into between Franklin C. Heller, II, and Jeanie Heller, residents of Marshall County, West Virginia, and TriEnergy, Inc. ("TriEnergy"), a Pennsylvania corporation (the "Lease").

#### A.   Formation of the Lease

In July and August 2006, a TriEnergy landman named Gray Montague approached the Hellers at their Marshall County residence to offer them the Lease, which he had prepared on behalf of TriEnergy.  Montague described the Lease as "standard" and one that "everyone was signing."  Montague advised the Hellers that a one-time bonus of $10.00, delay rental payments of $5.00 per acre per year, and a state-law minimum one-eighth royalty payment were the "going rates" in the marketplace and that no gas company would pay more. Nevertheless, Montague offered to increase the bonus payment to $10.00 per acre and promised the Hellers "free gas" that could be used wherever they desired "as long as they didn't sell it," including using the gas in "outhouses or chicken houses."  In addition, Montague stated that drilling "would begin in six months," and be celebrated by a "big catered party with BBQ chicken and beer" sponsored by TriEnergy.  Montague further represented that the royalty payments the Hellers would receive would compare to those received by a Washington County, Pennsylvania, dairy farmer who was receiving $50,000 in monthly royalties per well, adding, "Every time they drill a well you get a check."

The Hellers then asked Montague whether they would be "ripped off" by him or TriEnergy. Montague responded that "we're regulated by the government."  The Hellers understood Montague's statement to mean that Montague's activities were regulated by

2

the government.  Finally, Montague suggested that if the Hellers did not sign the Lease, they would "miss the boat" and no other gas company would be willing to sign a lease with them.

Although sign-on bonuses, delay rentals, and royalty payment rates for leases on similarly situated properties in the region were in fact substantially more favorable to lessors, the Hellers signed the Lease.  Montague delivered the Lease to be notarized by Michael P. Trout, a resident of Wood County, West Virginia.  On August 24, 2006, Trout notarized the Lease outside the presence of the Hellers whose signatures he did not personally witness.  Montague signed the lease on behalf of TriEnergy.

### B.    Terms of the Lease

Pursuant to the Lease, which is two-and-one-half pages in length and contains twenty-six paragraphs, the Hellers leased approximately 258 acres of their property located in the Union District of Marshall County to TriEnergy, its successors and assigns, for the purpose of "exploring for, developing, producing and marketing oil and gas, including methane gas present in any coal seam, along with all hydrocarbon substances produced in association therewith . . .."  (Lease at ¶¶ 1-2).  The Hellers also granted TriEnergy the right to "pool or unitize the leased premises, or any part thereof, with any other property for the production of [oil or gas], so as to create one or more drilling or production units" with the condition that "[s]aid drilling or production units shall not exceed six hundred forty (640) acres."  (Id. at ¶ 8).

As consideration for the Lease, TriEnergy agreed to pay the Hellers a one-eighth royalty from the proceeds of any sales of oil or gas discovered on the premises as well as rent in the amount of $5.00 per acre for each twelve months prior to commencement of

3

work for the drilling of a well.  (Id. at ¶¶ 4, 6).  In addition, the Lease permitted the Hellers to use gas produced "over and above the amount required for operations by the Lessee" for "domestic purposes, free of charge, . . . not to exceed 300,000 cubic feet of gas per annum."  (Id. at ¶ 20).

The Lease was to remain in force "for a primary term of five (5) years from the date of this lease and for so long thereafter as oil, gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith or this lease is otherwise maintained pursuant to the provisions hereof."  (Id. at ¶ 3).  The Lease also provided that "[i]f, at the end of the primary term or any time thereafter, this lease is not being kept in force by any other provision hereof, but Lessee is then engaged in drilling, reworking or any other operation calculated to obtain production on the leased premises or lands pooled therewith, this lease shall remain in force as long as such operations are conducted in a reasonably prudent manner and, if such operations result in the production of any substance covered hereby, as long thereafter as production continues in paying quantities."  (Id. at ¶ 7).  The Hellers further agreed that they would not "grant an oil and gas lease or similar right for oil and gas covering the premises . . . leased . . . to any other party during the primary term of the lease" and that TriEnergy would have the "first option to lease the oil and gas rights underlying the described premises for a period ending sixty (60) days after the primary term of th[e] lease."  (Id. at ¶ 16).

The Lease also contains the following arbitration clause:

Any question concerning this lease or performance thereunder shall be ascertained and determined by three disinterested arbitrators, one thereof to be appointed by the Lessor, one by the Lessee and the third by the two so

4

appointed as aforesaid, and the award of such three persons shall be final and conclusive.  The cost of such arbitration will be borne equally by the parties.

(Id. at ¶ 17).

### C.     Assignments of the Lease

In December 2008, TriEnergy assigned its rights under the Lease to TriEnergy Holdings, LLC ("TriEnergy Holdings"), which has a Pennsylvania citizen as its sole member. TriEnergy Holdings, though retaining an overriding royalty, subsequently assigned its rights under the Lease to AB Resources, LLC ("AB Resources), which has a member limited liability company with members all over the United States.  In January 2011, AB Resources assigned fifty percent of its rights under the Lease to Chief Exploration and Development, LLC, and Radler 2000 Limited Partnership.  Those entities assigned their rights under the Lease to Chevron U.S.A., Inc. ("Chevron"), a Pennsylvania corporation with its principal place of business in California.  On August 5, 2011, AB Resources assigned its remaining rights under the Lease to Chevron.

### D.     Performance of the Lease

Effective August 8, 2011, TriEnergy Holdings and Chevron pooled and unitized all or a portion of the property covered by various leases to form a production unit of 457.6539 acres, known as the F. Heller Unit.  Included in the F. Heller Unit was a portion of the property owned by the Hellers consisting of 66.00 acres.

As of August 22, 2011, when the primary term of the lease was set to expire, no oil or gas had been produced or was being produced in paying quantities from the leased premises or from property pooled therewith.  Prior to that date, neither TriEnergy nor any

of the subsequent assignees: (1) engaged in drilling, reworking, or any other operation calculated to obtain production on the Hellers' properties or lands pooled therewith; (2) conducted operations in a reasonably prudent manner; or (3) conducted its operations so as to result in the production of gas on the subject property in paying quantities.

## II.    <u>Procedural History</u>

On February 21, 2012, the Hellers filed suit against TriEnergy, TriEnergy Holdings, AB Resources, Chevron, Montague, and Trout in the Circuit Court of Marshall County, West Virginia.  The Complaint [Doc. 3-1] contains fourteen causes of action.

Count I alleges that TriEnergy Holdings, AB Resources, and/or Chevron breached the covenant to diligently and reasonably explore, develop, produce, and market the leaseholds of the subject property that is in implied in the Lease.  Count II claims that TriEnergy Holdings and Chevron pooled the Hellers' property in bad faith.  Count III asserts that TriEnergy, by and through Montague, fraudulently induced the Hellers to sign the Lease.  Count IV alleges that the Lease is unconscionable.  Count V is a claim for fraud that is similar to the one alleged in Count III.  Count VI alleges that the arbitration clause in the Lease is unconscionable. Counts VII and VIII assert that Trout breached his statutory duties as a notary and committed fraud.  Count IX alleges that the Lease expired on its own terms and that possession by TriEnergy Holdings and/or Chevron constitutes an unlawful holdover.  Count X alleges generally that the defendants' actions have slandered the title to the Hellers' land.  Count XI is a claim of trespass based upon the holdover alleged in Count IX.  Count XII alleges generally that the defendants' actions constitute the tort of outrage. Count XIII asserts that the defendants acted as part of a civil conspiracy.  Count XIV seeks declaratory relief that parallels the allegations in support of the other causes of

6

action.

On March 26, 2012, Chevron removed the above-styled action to this Court asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332 [Doc. 6]. Chevron argues that complete diversity exists once this Court disregards the citizenship of AB Resources and Trout. In addition, Chevron argues that common sense dictates that the amount in controversy is greater than $75,000.

On March 26, 2012, TriEnergy and TriEnergy Holdings filed the instant Motion to Dismiss [Doc. 3], arguing that the Complaint should be dismissed and this matter should be submitted to arbitration. On March 30, 2012, AB Resources filed the instant Motion to Compel Arbitration or, in the Alternative, Motion to Dismiss [Doc. 7], also asking this Court to submit this matter to arbitration. On April 2, 2012, Chevron filed the instant Motion to Compel Arbitration or, in the Alternative, Motion to Dismiss [Doc. 9], seeking enforcement of the arbitration clause while informing the Court that AB Resources had accepted its offer to defend it pursuant to a prior indemnification agreement. On May 8, 2012, Montague filed the instant Motion to Dismiss [Doc. 17], requesting the same relief.

On May 15, 2012, the Hellers responded in opposition the defendants' motions to compel arbitration [Doc. 23]. The Hellers ask this Court to find that the arbitration clause in the Lease is unconscionable. On May 23, 2012, TriEnergy and TriEnergy Holdings replied that the arbitration clause is not unconscionable because it contains no unfair terms [Doc. 25]. On May 29, 2012, Chevron replied for it and AB Resources also arguing that the Hellers have failed to identify any unfair terms in the arbitration clause [Doc. 27].

In the meantime, on April 25, 2012, the Hellers filed the instant Motion to Remand [Doc. 10] arguing that diversity jurisdiction does not exist because: (1) the citizenship of AB

7

Resources should not be disregarded, (2) the citizenship of Trout should not be disregarded, and (3) the amount in controversy requirement is not satisfied.

On May 15, 2012, Chevron responded on its and AB Resource's behalf contending that: (1) AB Resources is a nominal party, (2) Trout was fraudulently joined, and (3) a pre-litigation demand establishes the amount in controversy requirement [Doc. 21].  The same day, TriEnergy and TriEnergy Holdings joined in Chevron's response [Doc. 22].  On May 29, 2012, the Hellers filed a reply brief reasserting his previous arguments that the citizenship of AB Resources and Trout should not be disregarded [Doc. 26].

Therefore, the parties' motions present two sequential issues, namely: (1) whether this Court has diversity jurisdiction, and if so, (2) whether this Court should enforce the arbitration clause contained in the Lease.

## DISCUSSION

I.   **Applicable Standards**

A.   **Motion to Remand**

Defendants in civil actions may remove a matter from state to federal court if the latter forum has original subject matter jurisdiction.  This requirement can be based upon diversity jurisdiction or federal question jurisdiction.  28 U.S.C. § 1441.  A federal district court has diversity jurisdiction over cases between citizens of different states where the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  28 U.S.C. § 1332.

"The burden of demonstrating jurisdiction resides with 'the party seeking removal.'" ***Maryland Stadium Authority v. Ellerbe Becket Incorporated***, 407 F.3d 255, 260 (4th Cir. 2005) (citing ***Mulcahey v. Columbia Organic Chems. Co.***, 29 F.3d 148, 151 (4th Cir.

8

1994)).  Because removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly.  **Shamrock Oil & Gas Corp. v. Sheets**, 313 U.S. 100 (1941).  If federal jurisdiction is doubtful, a remand to state court is required.  **Maryland Stadium**, 407 F.3d at 260.  On the other hand, if this Court has jurisdiction, it is required to exercise it.  **Gum v. General Electric Co.**, 5 F.Supp.2d 412, 415 (S.D. W.Va. 1998) ("It is well-established federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'").

### B.     Motions to Compel Arbitration

The defendants rely upon the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, in support of their motions to compel arbitration.  Specifically, section 2 of the FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

A party can compel arbitration by establishing:  (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute.  *See* **Adkins v. Labor Ready, Inc.**, 303 F.3d 496, 500-01 (4th Cir. 2002).

Generally, "[t]he FAA reflects 'a liberal federal policy favoring arbitration agreements.'"  **Adkins**, 303 F.3d at 500 (quoting **Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.**, 460 U.S. 1, 24 (1983)).  Indeed, the FAA serves as "a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice."  **Circuit City Stores, Inc. v. Adams**,

9

532 U.S. 105, 111 (2001).  Moreover, a court is required to "resolve 'any doubts concerning the scope of arbitrable issues ... in favor of arbitration.'"  *Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25).

Finally, there is one important caveat to the reach of the FAA.  "Although federal law governs the arbitrability of disputes, ordinary state-law principles resolve issues regarding the formation of contracts.  *Hill,* 412 F.3d at 543 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24).  For example, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA.  *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (citations omitted).

## II.  Analysis

### A.  Motion to Remand

The Hellers argue that remand is required because AB Resources is a non-nominal, non-diverse party; Trout is a properly joined, non-diverse party; and the defendants have failed to show that the requisite amount is in controversy.  For the reasons that follow, this Court disagrees.

### 1.  AB Resources is a Nominal Party.

In opposing remand based upon AB Resource's potentially non-diverse citizenship, the defendants contend that AB Resources is a nominal party and thus that its citizenship should be disregarded for diversity purposes.  This Court agrees.

"In order to establish diversity jurisdiction . . . , a party must demonstrate that the action is between 'citizens of different States.'  The Supreme Court of the United States has

further established that 'the citizens upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy.  Thus, a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.'" *Williamson v. Gravely*, 2010 WL 2836122, *2 (N.D. W.Va. July 19, 2010) (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460-461 (1980)).  "The United States Court of Appeals for the Fourth Circuit has not provided a clear standard for determining who constitutes a 'nominal party' for removal purposes."  *Id.* (citing *Creed v. Virginia*, 596 F.Supp.2d 930 (E.D. Va. 2009)).  "District courts within this Circuit, therefore, have devised various tests."  *Id.* (citations omitted).  Some courts consider whether the party has a real interest in the litigation.  *See e.g., Owens v. Overstreet*, 2010 WL 4721709, *3-4 (S.D. W.Va. Nov. 15, 2010) (describing nominal parties as those without "a real interest in the litigation" or a "substantial stake in the outcome of the case").  Other courts apply the standard for fraudulent joinder, i.e., whether the plaintiff has a possible claim against the party.  *See e.g., Sherman v. Litton Loan Servicing, L.P.*, 796 F.Supp.2d 753, 761 (E.D. Va. 2011) ("[A]lthough the Fourth Circuit has not yet explicitly articulated a test for determining whether a party is 'nominal' or 'formal,' other courts have regarded the standard as being essentially the same as that for fraudulent or improper joinder.").  Still other courts seek to determine "whether in the absence of [the defendant], the Court can enter a final judgment consistent with equity and good conscience which would not be in any way unfair or inequitable to [the] plaintiff."  *Mayes v. Moore*, 367 F.Supp.2d 919, 922 (M.D. N.C. 2005).

Therefore, an amalgamation of these tests requires that the defendants make three showings, namely: (1) AB Resources does not have a real interest in this litigation, (2)

11

Heller does not have a possible claim against AB Resources, and (3) entry of a final judgment in the absence of AB Resources would be equitable.  Below, this Court will consider each test in turn.

### i.      Real Interest in Litigation

A review of the record illustrates that AB Resources does not have a real interest in this litigation because it no longer has any rights under the Lease.

Prior to the commencement of this action in state court, AB Resources had assigned away all of its rights under the Lease.  In January 2011, AB Resources assigned fifty percent of its rights under the Lease to Chief Exploration and Development, LLC, and Radler 2000 Limited Partnership.   In August 2011, AB Resources assigned its remaining rights under the Lease to Chevron.  As such, AB Resources has no financial stake in the outcome of this case.  This test, therefore, weighs in favor of finding that AB Resources is a nominal party.

### ii.      Possible Claim

A review of the Complaint and the Lease shows that the Hellers have no possible claim against AB Resources as a matter of law.  As his sole claim against AB Resources, the Hellers assert that AB Resources breached a covenant to diligently and reasonably explore, develop, produce, and market the leaseholds of the subject property that is in implied in the Lease.  However, without an express breach of contract, the Hellers' claim is not a viable cause of action.

In West Virginia, "a covenant of good faith and fair dealing is implied in every contract . . .." **Spoor v. PHH Mortg. Corp.**, 2011 WL 883666, *4 (N.D. W.Va. Mar. 11, 2011) (citations omitted).  However, "West Virginia law does not recognize an independent

cause of action for a breach of duty of good faith and fair dealing separate and apart from a breach of contract claim." *Id.* (citations omitted).  Likewise, this Court finds nothing in West Virginia law that recognizes an independent cause of action for a breach of an implied covenant to develop a leasehold.

Applying these rules of law, this Court first observes that the Complaint does not contain a claim alleging that AB Resources breached any express provision contained in the Lease.  Second, this Court questions whether, given the opportunity, the Hellers could allege an express breach of the Lease based upon a failure to develop.  According to the express terms of the Lease, development of the leasehold was merely a condition for automatically extending the primary term.  (Lease at ¶ 3) ("[T]his lease shall be in force for a primary term of five (5) years from the date of this lease *and for so long thereafter as oil, gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith* . . ..") (emphasis added).  Failure to produce was contemplated, and the penalty the parties agreed upon for failure to produce was termination of the Lease.  Without an express breach of the Lease, the Hellers cannot pursue a breach of the implied covenant to produce against AB Resources as a matter of law. Therefore, the Hellers have no possible claim against AB Resources.  As such, this test likewise weighs in favor of finding that AB Resources is a nominal party.

### iii.    Equitable Judgment

Entering judgment in the absence of AB Resources would not be unfair or inequitable to the Hellers because Chevron has agreed to defend against and pay any judgment on behalf of itself and AB Resources in the event either entity is found liable. Accordingly, this test also weighs in favor of finding that AB Resources is a nominal party.

13

Having applied the above three tests, this Courts concludes that AB Resources is a nominal party.  Therefore, this Court will disregard the citizenship of AB Resources in determining whether complete diversity exists among the real parties in interest.

### 2.      Trout is Fraudulently Joined.

In opposing remand based upon Trout's non-diverse citizenship, the defendants argue that he has been fraudulently joined and thus that his citizenship should be disregarded for diversity purposes.  This Court agrees.

A district court may disregard the citizenship of defendants who were fraudulently joined.  *Herbalife Intern., Inc. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 839515, at *3 (N.D. W.Va. Mar. 30, 2006).   "To show fraudulent joinder, the removing party must demonstrate . . . that there is no possibility that plaintiff would be able to establish a cause of action against the instate defendant in state court."  *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (internal quotations omitted).

The Complaint contains two causes of action directed against Trout.  Count VII asserts that Trout breached his statutory duties as a notary by acknowledging the Hellers' signature without witnessing the same.   Count VIII alleges that the same act also constituted fraud.  To find that Trout was fraudulently joined, therefore, requires this Court to conclude that the Hellers could not possibly succeed on either claim.

Pursuant to the Uniform Notary Act, "[a] notary public is liable to the persons involved for all damages *proximately caused* by the notary's official misconduct."  W.Va. Code § 29C-6-101 (emphasis added).  However, any finding of proximate cause here is precluded by the Hellers' own concession that they signed the Lease.  Without proximate cause, there can be no possible claim against Trout.  *Accord* **Wolfe v. Greentree Mortg.**

14

*Corp.*, 2010 WL 391629, *3 (N.D. W.Va. Jan. 26, 2010) ("Given the fact that the plaintiff does not contest the fact that she, in fact, signed the deed of trust, there can be no damage emanating from the notary public's failure to properly acknowledge that signature.  Since there is no damage, there is no 'glimmer of hope' of a judgment against defendant Freda [the notary public].").  As such, this Court finds that Trout was fraudulently joined by the Hellers.  Therefore, this Court will disregard the citizenship of Trout in determining whether complete diversity exists among the properly joined parties.

Because AB Resources and Trout are the only named parties that are non-diverse, and their citizenship has been disregarded, this Court finds that complete diversity exists.  Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as long as the requisite amount in controversy has been established.

### 3.   Defendants Have Established that Amount in Controversy Requirement is Satisfied by a Preponderance of the Evidence.

In a removal action in which federal jurisdiction is premised upon 28 U.S.C. § 1332, the defendant bears the burden of proving that the plaintiff's claim exceeds the jurisdictional amount.  ***Landmark Corp. v. Apogee Coal Co.***, 945 F.Supp. 932, 935 (S.D. W.Va. 1996).  Often, this burden is settled without argument because a plaintiff's good-faith claim for specific monetary damages in the complaint binds the defendant.  ***St. Paul Mercury Indem. Co. v. Red Cab Co.***, 303 U.S. 283, 288 (1938); *see also* ***Horton v. Liberty Mut. Ins. Co.***, 367 U.S. 348, 353 (1961) (stating that general federal rule is that complaint determines the amount in controversy and, consequently, federal jurisdiction).  However, when the complaint's *ad damnum* clause does not specifically state the amount in controversy, several courts require the removing defendant to prove by a preponderance

of the evidence that the value of the matter in controversy exceeds the jurisdictional amount. *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1357 (11th Cir. 1996); *De Aguilar v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 158 (6th Cir. 1993); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403-04 (9th Cir. 1996); *Lohan v. Am. Express* Co., 2009 WL 2567853 (S.D. W.Va. Aug. 19, 2009); *Allman v. Chancellor Health Partners, Inc.*, 2009 WL 514086 (N.D. W.Va. Mar. 2, 2009).

In order to meet the preponderance of the evidence standard and to establish jurisdiction upon removal, a defendant must show that it is more likely than not that the amount in controversy exceeds the jurisdictional amount. *Landmark Corp.*, 945 F.Supp. at 935 (citing *Tapscott*, 77 F.3d at 1357). To satisfy this burden, a defendant must offer more than a bare allegation that the amount in controversy exceeds $75,000. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 567 (9th Cir. 1992). Instead, a defendant seeking removal must "supply evidence to support his claim regarding the amount at issue in the case." *Sayre v. Potts*, 32 F.Supp.2d 881, 886 (S.D. W.Va. 1999).

Specifically, the amount in controversy is determined by "considering the judgment that would be entered if the plaintiff prevailed on the merits of his case as it stands at the time of removal." *Id.* (citing *Landmark Corp.*, 945 F.Supp. at 636-37). To calculate this amount, a court must consider the entire record and make an independent evaluation of whether the amount in controversy has been satisfied. *Weddington v. Ford Motor Credit Co.*, 59 F.Supp.2d 578, 584 (S.D. W.Va. 1999); *see also Mullins v. Harry's Mobile Homes*, 861 F.Supp. 22, 24 (S.D. W.Va. 1994) (specifically stating that court may consider complaint, removal petition, and "other relevant matters in the file"). In conducting this

16

analysis, the court may consider:

> the type and extent of the plaintiff's injuries and the possible damages recoverable therefore, including punitive damages if appropriate.  The possible damages recoverable may be shown by the amounts awarded in other similar cases.  Another factor for the court to consider would be the expenses or losses incurred by the plaintiff up to the date the notice of removal was filed.  The defendant may also present evidence of any settlement demands made by the plaintiff prior to removal although the weight to be given such demands is a matter of dispute among courts.

*Watterson v. GMRI, Inc.*, 14 F.Supp.2d 844, 850 (S.D. W.Va. 1997) (internal citations omitted).  Finally, in resolving the amount in controversy issue, a court "is not required to leave its common sense behind."  *Mullins*, 861 F.Supp. at 24.

### i.   Complaint

"The starting point for ascertaining the amount in controversy when the petition for removal was filed is obviously the complaint itself."  *Sayre*, 32 F.Supp.2d at 887 (citing *Hicks v. Universal Housing, Inc.*, 792 F.Supp. 482, 484 (S.D. W.Va. 1992) ("The Courts have long held that the question of jurisdictional amount for purposes of removal is controlled by the allegations of plaintiff's complaint as those allegations exist at the time the petition for removal is filed.")).

Here, a review of the Complaint indicates that the amount in controversy exceeds the jurisdictional amount.  At the core of this dispute is the Hellers' claim that he was fraudulently induced into the subject Lease.  According to the Hellers, one of the more substantial inducements consisted of a representation from TriEnergy's Montague that the royalty payments the Hellers would receive would compare to those received by a

17

Washington County, Pennsylvania, dairy farmer who was receiving $50,000 in monthly royalties per well.   In addition, the Complaint contains what appears to be a good faith claim for punitive damages.  *See **Bryant v. Wal-Mart***, 117 F.Supp.2d 555, 556-557 ("[A] good faith claim for punitive damages may augment compensatory damages in determining the amount in controversy unless it can be said to a legal certainty that the plaintiff cannot recover punitive damages in the action.").  Based upon a fair reading of the Complaint, therefore, this action more likely than not involves more than $75,000.

### ii.    Independent Evaluation

"However, the analysis does not stop with a perusal of the . . . complaint."  ***Sayre***, 32 F.Supp.2d at 887.  In opposing remand on the amount in controversy, the defendants have also attached evidence relating to a pre-litigation settlement demand made by Heller's prior counsel, Herman Lantz.  The Court will now conduct an independent evaluation of those materials.

The defendants attach the affidavit of a Chevron representative named Michael W. Beckett.  According to the affidavit, Beckett met with Mr. Heller at Lantz's office on November 18, 2011. (Beckett Affidavit at ¶ 5).  During the meeting, Lantz inquired whether Chevron would increase the Hellers' royalty payments.  (Id. at ¶ 8).  Beckett responded that the Lease was still in effect and that he was not authorized to negotiate such a proposal. (Id.).  After the meeting, Beckett received an e-mail from Lantz proposing increased royalty payments for the Hellers.  (Id. at ¶ 9).  According to the e-mail, which the defendants also attach, the Hellers demanded, *inter alia*, $3,500 per acre up front.  (Nov. 18, 2011, E-Mail at 1).  Based upon approximately 258 acres, this demand totaled over $900,000.

Therefore, considering the totality of the circumstances surrounding this case, the Court finds that the defendants have met their burden of showing by a preponderance of the evidence that the Hellers' claims meet the amount in controversy requirement associated with diversity jurisdiction.  Accordingly, this Court finds that it has subject matter jurisdiction over this controversy and that Heller's motion to remand should be **DENIED**.

**B.   Motions to Compel Arbitration**

Despite the existence of subject matter jurisdiction, the defendants contend that this Court should submit the Hellers' claims to arbitration pursuant to the arbitration clause contained in paragraph 17 of the Lease.  For the reasons that follow, this Court agrees.

**1.   Defendants Have Satisfied the Elements for Compelling Arbitration.**

As outlined above, a party can compel arbitration by establishing:  (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute.  *See **Adkins***, 303 F.3d at 500-01.

In the instant case, there can be no dispute that the first, third, and fourth elements are satisfied.  First, there is clearly a dispute between the parties, as evidenced by the Hellers' filing of this lawsuit.  Second, the contract at issue is related to interstate commerce, as it was formed between citizens of different states for oil and gas exploration

19

using materials likely to be transported in interstate commerce.[1]  Finally, the Hellers has refused to arbitrate, which is also evidenced by the filing of this lawsuit.

The defendants have also satisfied the third element, requiring "a written agreement that includes an arbitration provision which purports to cover the dispute."  *See **Adkins***, 303 F.3d at 500-01.  The Lease contains a clear, unambiguous, and broad arbitration provision covering all disputes that might arise between the parties.  Specifically, paragraph 17 of the Lease provides, in pertinent part, that:

> ***Any question concerning this lease or performance thereunder*** shall be ascertained and determined by three disinterested arbitrators . . ..

(Lease at ¶ 17) (emphasis added).

The Hellers have asserted breach of the implied covenant to produce, bad faith pooling, fraudulent inducement, unconscionability, unlawful holdover, slander of title, the tort of outrage, and civil conspiracy.  Each of these claims relates either to the Lease itself, to the property, or to the circumstances surrounding the formation and alleged termination of the Lease.  As such, the arbitration clause purports to cover the Hellers' claims, and thus, the defendants have satisfied every element required to compel arbitration.  Accordingly, unless the Hellers can present a defense to the enforceability of the arbitration clause, this Court will order their claims submitted to arbitration.

---

[1]The question of what constitutes interstate commerce has been broadly interpreted, and the Supreme Court of the United States has described the FAA's "reach expansively as coinciding with that of the Commerce Clause."  ***Allied-Bruce Terminix Companies, Inc. v. Dobson***, 513 U.S. 265, 274 (1995).  Moreover, "it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce' – that is, 'within the flow of interstate commerce.'" ***The Citizens Bank v. Alafabco, Inc.***, 539 U.S. 52, 57 (2003).

**B.      The Hellers Have Failed to Establish an Adequate Defense to Prevent Enforcement of the Arbitration Clause.**

The Hellers present two main arguments in an effort to challenge the enforceability of the arbitration clause in question, namely: (1) the arbitration clause is unconscionable and (2) the Lease was fraudulently induced and contains other unconscionable provisions. For the reasons that follow, this Court finds neither of these arguments persuasive in light of the FAA's liberal policy favoring arbitration agreements. *See Adkins,* 303 F.3d at 500.

### 1.      Arbitration Clause – Unconscionability

In West Virginia, "[a] contract term is unenforceable if it is both procedurally and substantively unconscionable.  However, both need not be present to the same degree. Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa."  Syl. pt. 9, ***Brown v. Genesis Health Corp.***, — S.E.2d — , 2012 WL 2196090 (W.Va. June 13, 2012) ("***Brown II***') (quoting Syl. pt. 20, ***Brown v. Genesis Health Corp.***, — W.Va. — , 724 S.E.2d 250 (2011) ("***Brown I***')).

"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract.  Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction.  These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed,

21

including whether each party had a reasonable opportunity to understand the terms of the contract." Syl. pt. 10, **Brown II** (quoting Syl. pt. 17, **Brown I**).

"Substantive unconscionability involves unfairness in the contract itself and whether a contract terms is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." Syl. pt. 10, **Brown II** (quoting Syl. pt. 19, **Brown I**).

Here, assuming the truth of the Hellers' allegations regarding the formation of the Lease and that those allegations constitute procedural unconscionability, even a sliding scale requires the Hellers to identify a commercially unreasonable term within the arbitration clause to support a finding of substantive unconscionability. Below, the Court addresses each of the Hellers' arguments for substantive unconscionability in turn.

### i.      Cost Sharing Provision

The Hellers first argue that the arbitration clause is substantively unconscionable because it contains a cost sharing provision. Specifically, the cost sharing provision states, "The cost of such arbitration will be borne equally by the parties." (Lease at ¶ 17). This Court is unpersuaded that this cost sharing provision renders the challenged arbitration clause substantively unconscionable.

In any challenge to a cost sharing provision, "the responsibility of showing the costs likely to be imposed by the application of such a provision is upon the party challenging the provision; the issue of whether the costs would impose an unconscionably impermissible

burden or deterrent is for the court."  Syl. pt. 13, **Brown II** (quoting Syl. pt. 4, **Brown I**).

The Hellers allege that the cost sharing provision "might force [him] to pay thousands of dollars in up-front fees and costs before the start of litigation, effectively precluding him from vindicating his rights or pursuing claims in arbitration given his financial situation[.]" ([Doc. 6-1] at ¶ 55).  This conclusory allegation, without more, is inadequate to show the costs likely to be imposed by the application of the cost sharing provision at issue.  Even assuming the truth of this allegation, the Hellers have failed to provide any evidence that would lead this Court to find that the costs would impose upon him an unconscionably impermissible burden or deterrent.  Accordingly, this Court concludes that the challenged cost sharing provision is substantively conscionable and does not preclude enforcement of the arbitration clause.

### ii.    Framework for Arbitration Process

Next, the Hellers argue that the arbitration clause is substantively unconscionable because "it does not sufficiently define a framework for the arbitration process including, but not limited to, the absence of such items as the rules and procedures of arbitration, discovery rights or remedies, appointment of mediators, duties and responsibilities of the arbitrators, conduct of proceedings, including whether the evidentiary rules apply, the form of the award, the scope of the award, and, what constitutes costs, fees and expenses of arbitration and who should pay for the same."  ([Doc. 6-1] at ¶ 55).  This Court is unconvinced that the absence of these items, when accurate, render the challenged arbitration clause substantively unconscionable.

As an initial matter, this Court finds it necessary to identify two inaccuracies in Heller's allegation.  First, the arbitration clause does explain the scope of the award: "[T]he

award of such three persons shall be final and conclusive." (Lease at ¶ 17). Second, the arbitration clause does identify who should pay the costs: "The cost of such arbitration will be borne equally by the parties." (Id.).

Next, this Court notes that the Supreme Court of the United States has upheld the enforceability of an arbitration clause that entirely failed to address fees and costs. *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90-91 (2000). As such, the failure of the challenged arbitration clause to identify the costs to be shared by the parties does not alone support a finding of unconscionability.

Considering the remaining items identified in the allegation, this Court concludes that the absence of those items does not render the arbitration clause unenforceable in light of section 5 of the FAA, which provides in pertinent part:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein . . . , then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5. In reliance upon this provision, courts have found that the failure to specify the identity of the arbitrator, method for selecting an arbitrator, rules to govern arbitration, forum, location, whether arbitration is binding, or allocation of costs from the arbitration does not render an arbitration clause unenforceable. *See Blinco v. Green Tree Serv. LLC*, 400 F.3d 1308, 1312-13 (11th Cir. 2005); *S. Ala. Pgs, LLC v. Farmer Feeders, Inc.*,

305 F.Supp.2d 1252, 1261-62 (S.D. Ala. 2004); *Jones v. GGNSC Pierre LLC*, 684 F.Supp.2d 1161, 1166-68 (D. S.D. 2010).  Finding those decisions persuasive, this Court concludes that the absence of the remaining items identified in the Hellers' allegation does not render the challenged arbitration clause substantively unconscionable.  In the event that the parties are unable to agree upon the items surrounding the selection of the arbitrators, section 5 of the FAA may provide the parties with appropriate relief.

### iii.    Relief Available at Law

The Hellers also argue that the arbitration clause is substantively unconscionable because "it fails to provide that the arbitrators can award all relief that may be available in a court of law."  ([Doc. 6-1] at ¶ 55).  This Court disagrees.

Invalidating an arbitration clause because it fails to provide for the same remedies available in a court of law, no matter the remaining incentives to arbitrate, would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress" in enacting the FAA and would be preempted under the doctrine of conflict preemption.  *United States v. Locke*, 529 U.S. 89, 109 (2000) (internal quotations and citations omitted).  Accordingly, the arbitration clause is not substantively unconscionable because it fails to provide that the arbitrators can award all relief that may be available in a court of law.

### iv.    Equal Waiver of Right to Jury

Finally, the Hellers argue that the arbitration clause is substantively unconscionable because "it fails to provide that both parties waive their right to a trial by jury." ([Doc. 6-1] at ¶ 55).  This Court once more disagrees.

It is axiomatic that "[w]hen parties agree to resolve their disputes through arbitration, they concomitantly agree to *not* resolve their disputes by going to court." **Merill Lynch, Pierce, Fenner & Smith, Inc. v. Coe**, 313 F.Supp.2d 603, 615 (S.D. W.Va. 2004) (emphasis in original).  Here, the parties expressly agreed that "[a]ny question concerning this lease or performance thereunder shall be ascertained and determined by three disinterested arbitrators" and that "the award of such three persons shall be final and conclusive."  (Lease at ¶ 17).  Clearly then, the parties agreed to resolve their disputes through arbitration and concomitantly to not resolve their disputes by going to court.  In other words, the parties both waived their right to a trial by jury.  Accordingly, the arbitration clause is not substantively unconscionable because it fails to separately include a waiver of jury provision.

Therefore, this Court concludes that the arbitration clause at issue is not substantively unconscionable and thus is not subject to the state common law defense of unconscionability.

### 2.    Lease – Fraudulent Inducement / Unconscionability

As a last resort, the Hellers argue that the arbitration clause should not be enforced because the Lease was fraudulently induced and contains other provisions that are unconscionable.  This Court, however, is not the proper forum to consider these arguments.

It is well established that, "if a party seeks to avoid arbitration and/or a stay of federal court proceedings pending the outcome of arbitration by challenging the validity or enforceability of an arbitration provision on any grounds that 'exist at law or in equity for the revocation of any contract,' 9 U.S.C. § 2, the grounds 'must relate specifically to the

26

arbitration clause and not just to the contract as a whole.' ***Snowden v. CheckPoint Check Cashing***, 290 F.3d 631, 636 (4th Cir. 2002) (quoting ***Hooters of Am., Inc. v. Phillips***, 173 F.3d 933, 938 (4th Cir. 1999)).   In fact, "when claims allege unconscionability of the contract generally, these issues are determined by an arbitrator because the dispute pertains to the formation of the entire contract, rather than the arbitration agreement." ***Sydnor v. Conseco Fin. Serv. Corp.***, 252 F.3d 302, 305 (4th Cir. 2001).   Similarly, the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally."   ***Buckeye Check Cashing, Inc. v. Cardegna***, 546 U.S. 440, 445 (2006) (quoting ***Prima Paint Corp. v. Flood & Conklin Mfg. Co.***, 388 U.S. 395, 403-404 (1967)).   Accordingly, the Hellers' claims of fraudulent inducement and unconscionability that pertain to the contract as a whole are required to be decided by an arbitrator and thus cannot preclude application of an otherwise enforceable arbitration clause.

Therefore, the Hellers have failed to identify an adequate state law defense to the enforcement of the arbitration clause contained in paragraph 17 of the Lease.   As such, the same should be enforced pursuant to section 4 of the FAA.   Accordingly, the defendants' motions to compel arbitration should be **GRANTED**.

## <u>CONCLUSION</u>

For the reasons stated above, this Court concludes that plaintiffs Franklin C. Heller, II's and Jeanie Heller's Motion to Remand **[Doc. 10]** should be, and hereby is, **DENIED**. In addition, this Court concludes that defendants TriEnergy, Inc.'s and TriEnergy Holdings, LLC's Motion to Dismiss **[Doc. 3]**, defendant Chevron U.S.A., Inc.'s Motion to Compel Arbitration, or in the Alternative, Motion to Dismiss **[Doc. 9]**, and defendant Gray Montague's Motion to Dismiss **[Doc. 17]** should be, and hereby are, **GRANTED** to the

27

extent that they ask this Court to compel arbitration.   In this regard, defendant AB Resources, LLC's Motion to Compel Arbitration or, in the Alternative, Motion to Dismiss **[Doc. 7]** should be, and hereby is, **DENIED AS MOOT**.

Accordingly, the Hellers' claims are hereby **SUBMITTED TO ARBITRATION**, and his Complaint [Doc. 6-1] is **DISMISSED WITHOUT PREJUDICE**, subject to reopening on motion of any party, for good cause shown, within thirty (30) days for the sole purpose of filing a motion under section 5 of the FAA, if deemed appropriate and necessary.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record herein.

**DATED:** July 9, 2012.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

28